Charles Allen **STINSON**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. F–74–285.

Court of Criminal Appeals of Oklahoma.

Nov. 14, 1974.

Donald W. Davis, Oklahoma City, for appellant.

3. D.C.Code Ann. § 23–521, 23–522, 84 Stat. 473.

Larry Derryberry, Atty. Gen., Kenneth L. Delashaw, Jr., Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Presiding Judge:

The appellant, Charles Allen Stinson, hereinafter referred to as defendant, was charged, tried before a jury and convicted in the District Court of Dewey County, Oklahoma, for the crime of Murder. The jury returned a verdict of guilty and assessed his punishment at a term of life imprisonment in the state penitentiary. From a judgment and sentence in conformance with said verdict the defendant has perfected his timely appeal.

The evidence adduced at trial is as follows: Kiowa County Deputy Sheriff Robert Higgins testified that on the 2nd day of May, 1973, the defendant, accompanied by his mother and grandmother, came to Hobart and voluntarily committed himself to Western State Hospital at Ft. Supply. When Higgins last saw the defendant he was on the passenger side of Deputy Max Straub's car conversing with his relatives. Straub and the defendant then left for the hospital in a white on green Ford. At the time they left Straub was wearing a new 357 magnum pistol.

Oscar Hickey then testified that on May 2 he was working at a fruit stand at the intersection of two highways some two miles West of Seiling. At approximately 4:00 p. m. a white over green automobile approached the intersection and Hickey noticed that the two occupants were scuffling. Both occupants then disappeared from sight and Hickey heard several shots. The car then started rolling across the intersection, hitting an embankment and coming to a stop. A black man got out of the passenger side of the vehicle and proceeded around to the driver's side, got in, pushed something towards the passenger side and drove off.

Paul Turner then testified that at approximately 4:00 p. m. on the date in question, he approached the aforementioned intersection to observe a white over green Ford with two occupants inside. He observed the occupants wrestling in the front seat and the vehicle come rolling across the road towards him. One of the occupants, a black man, was the defendant. The vehicle proceeded to roll into a bar ditch and stop at which time the defendant, wearing lavender pants and jacket and a black t-shirt, got out of the car and then got in the driver's side. Turner then drove to Seiling and called the highway patrol. He subsequently saw the defendant walking on the outskirts of Seiling and again advised the patrol. He again saw the automobile approximately ¾ths of a mile east of the aforementioned intersection. It had run off the road, through a fence, and onto the edge of a wheat field.

Patrol Trooper Dave Dvorak then testified that he and his partner were advised of the incident and proceeded to the intersection and then to a wheat field where a white on green vehicle was found. The patrolmen approached the vehicle and found an officer lying in the front seat dead. He was then advised that an individual had been seen walking along the highway just northwest of the Seiling city limits and proceeded to investigate. They subsequently apprehended the defendant who was unarmed and wearing light purple pants, a purple jacket and a black t-shirt. The patrolman stated that the defendant was very quiet, but followed all instructions given him. No murder weapon was found.

Louis Louthan and Leslie Paris subsequently testified that on the day in question they were at the Broomfield Cemetery near Seiling when they saw a car plunge through a fence at the edge of a wheat field. A slim black male got out and started walking down the highway.

Dewey County Sheriff Lindsey Salisbury then testified concerning certain pictures he had taken of the car and its contents and further stated that no revolver had been found. The leather strap on Officer

Straub's holster used to secure the gun and hammer had been broken.

Dr. Robert A. Bush, County Medical Examiner in Seiling, related that when he arrived at the scene he examined the body and found no sign of life. He found three wounds, including one near the left ear with powder burns and one in the left chest with powder burns. Straub's body was then sent to Oklahoma City for an autopsy.

State Medical Examiner Dr. A. J. Chapman testified that on the 3rd day of May he examined the body of Max Straub and found two gunshot wounds, one in the head and one in the chest. The head wound was surrounded by powder burns which indicated that the firearm had been discharged in close proximity to the head. He further stated that either wound could have caused death.

Ray Lambert, Firearms Examiner for the Oklahoma State Bureau of Investigation, testified that in May, 1973, he received a .38 caliber bullet taken from Straub's body. Lambert stated that a .38 caliber bullet may be used in 357 revolver. Raymond Homer, identification officer, then testified that he ran tests on the defendant's hands for gunshot residue some nine hours after the incident. The tests were inconclusive. Homer further stated that the residue is water soluble and could be removed with ordinary washing. The State then rested.

The defendant called Perry Town who testified that on May 2 he was an agent for the Oklahoma State Bureau of Investigation and that he subsequently talked to Paul Turner with reference to the Straub homicide. Town related Turner's statement which reflected minor variations from Turner's in-court statement. Town further testified with reference to the location of several pools of blood in the back seat of the vehicle and on the back floorboard. He also related that he took part in the gunshot residue tests upon the defendant's hands and that there was water standing in the bar ditches around the vehicle.

Mrs. Ellie B. Littles, grandmother of the defendant, related that she had raised him, that he was a good youth, although he had spent two years in the state penitentiary for burglary, and that the defendant began acting strangely after he quit school at Okmulgee Tech. She stated that "he was scared to death all the time" and thought that somebody was after him. She took the defendant to a physician in Hobart who advised that he be sent to Ft. Supply. Shortly thereafter she took the defendant to the county jail to secure court approval for his voluntary commitment. She further stated that after the incident he never said a word to her.

Benjamin Marshall, defendant's cousin, then testified that the defendant spent the night in his home in the latter part of April, 1973, and that the defendant acted scared and wouldn't eat or sleep. He just looked at the wall and kept saying "someone is after me". The testimony of Jo Ann Gilbert, the defendant's aunt, was essentially the same as Mrs. Littles' and Marshall's.

Gerald Gunkel, a rehabilitation counselor for the State of Oklahoma in Altus, then related that he first met the defendant in April, 1972. After testing the defendant, the witness sent him to Okmulgee for a commercial art course. Although the defendant was doing well, Gunkel was subsequently notified that in April of 1973, he had dropped out of school. He then contacted the defendant and noted that he was no longer motivated. Kenneth Hodge, a supervising counselor at Okmulgee Tech, stated that he had counseled the defendant at the time of his enrollment. The defendant was quite normal, but finished only one term at school. The defendant subsequently dropped out in April, 1973. Allan Shaw, a teacher at Okmulgee State Tech, testified that the defendant was a good student and had no disciplinary problems, but dropped out after the second term.

Dr. Malcolm Birdwell, a physician in Hobart, Oklahoma, testified that on the 2nd day of May, 1973, the defendant was in his office with his mother and grandmother. The defendant stated that "he was having trouble getting things together, possibly that he was scared of something, he really couldn't put his finger on it and felt that he needed some help in getting these things straightened out or settled down." The doctor and the defendant then agreed that the defendant should voluntarily commit himself to Western State Hospital. On cross-examination the doctor stated that he only talked to the defendant for approximately fifteen minutes and that he believed the defendant understood the conversation. The defense then rested.

On rebuttal the State, over objection of defense counsel, called Dr. Loraine Schmidt, Chief of Forensic Psychiatry for the State Department of Mental Health. In relation to the instant charge, the defendant was sent to Dr. Schmidt for observation and evaluation at Central State Hospital on July 10, 1973 and remained until September 7, 1973. She testified that the defendant was non-psychotic, but had an anti-social disorder and dependence upon drugs and alcohol. She further testified that at first the defendant would not talk, but did so during the final few weeks of observation. The defendant stated that he had no alcohol on the day of the incident and that he had grabbed the deputy's gun and shot him twice. She further stated that the defendant was able to distinguish between right and wrong and to assist in his defense. The State then rested.

Although the issue was neither properly preserved in a motion for a new trial nor argued in the defendant's brief, a thorough reading of the transcript reflects that Dr. Loraine Schmidt, Chief of Forensic Psychiatry at Central State Hospital, was allowed to testify concerning certain admissions of guilt made to her by the defendant. The record also shows that, although defense counsel did not object to the statement made by the doctor, he did strenuously object at the time the doctor was first called to her divulging any information which she obtained through the doctor-patient relationship arising out of her observation, examination and treatment of the defendant.

The defendant was committed to Western State Hospital at Ft. Supply, Oklahoma, for observation and examination for a period not to exceed sixty (60) days upon the application of his court appointed attorney. Once committed the defendant was compelled to remain until released by the State Hospital. The purpose of said mental examination was to determine if the defendant was competent to stand trial. It was not the purpose of said examination to interrogate the defendant to determine his guilt or innocence. To allow medical personnel of a state mental institution to conduct a compulsory mental examination of an accused and then reveal as a State witness any confession or other inculpatory statement made by the accused in the course of said examination implicating the accused in the crime charged constitutes fundamental error. Noyes v. State, Okl. Cr., 516 P.2d 1368 (1973). In the instant case, the defendant was compelled to remain in the state institution and submit to examination and evaluation. The record reflects that when Dr. Schmidt first observed the defendant he would not talk. However, he did so during the final weeks of observation. For medical personnel of a state mental institution to gain the confidence of an accused through a doctor-patient relationship and then testify concerning said confidences at the trial of said accused will not be permitted by this Court. The judgment and sentence appealed from is reversed and remanded for new trial consistent with the terms and tenor of this opinion.

BRETT and BUSSEY, JJ., concur.